**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
**MANHATTAN DIVISION**

KEVIN SANTOS on behalf of himself and all others similarly situated,

*Plaintiff*,

v.

THE J.M. SMUCKER CO.,

*Defendant*.

Case No. ______________________

Plaintiff KEVIN SANTOS ("Plaintiff"), on behalf of himself and all others similarly situated, alleges the following class action complaint (the "Action") against Defendant THE J.M. SMUCKER CO. ("Smucker" or the "Defendant") for violations of state statutes and common law doctrines seeking actual damages, statutory damages, restitution, pre- and post-judgment interest, and reasonable costs and attorneys' fees upon personal knowledge as to himself and his own actions, and upon information and belief, including the investigation of his counsel as follows:

## INTRODUCTION

1. Smucker owns Cafe Bustelo ("Bustelo"), one of the most popular coffee brands in the United States and sells products under its ubiquitous "Cafe Bustelo" brand. This is a class action on behalf of purchasers of the purportedly decaffeinated version of Bustelo. The decaffeinated Bustelo contains caffeine despite its labeling as a decaffeinated offering (the "Products"). The Product comes in three formulations – ground coffee, instant coffee, and K-cup coffee pods; this Action concerns only ground coffee and K-cup coffee pod versions of the Product.

2. Caffeine is the most widely consumed drug in the world – but a significant amount of the United States population – millions of Americans – cannot consume it. This is because they are allergic to it or have other medical sensitivities to caffeine.

3. Naturally, coffee represents a major source of the caffeine intake: and decaffeinated caffeine that removes caffeine from coffee is a popular product for those millions of Americans who cannot consume the regular coffee products.

4. Indeed, and more specifically, various medical conditions necessitate caffeine-restricted diets. For example, patients on certain prescription medications are advised to discontinue caffeine intake. Such admonition has implications for certain psychiatric patients

because of pharmacokinetic interactions between caffeine and certain anti-anxiety drugs. Medical literature documents that caffeine can interact with commonly prescribed psychiatric medications, including benzodiazepines and other anti-anxiety agents, through shared hepatic metabolic pathways, potentially altering the clearance, efficacy, and side-effect profile of those medications for patients relying on stable therapeutic dosing[1]. To abstain from caffeine, patients may substitute decaffeinated for caffeinated coffee. However, decaffeinated beverages are known to contain caffeine in varying amounts.[2]

5. This case is about Defendant's marketing claim that its "decaffeinated" coffee products are actually free of caffeine. The representation that the Products are "decaffeinated" attract those millions of Americans seeking to buy and use coffee products for their own consumption while also not upsetting potential allergies or medical issues involving caffeine. However, on average, an 8-ounce (236-ml) cup of decaf coffee using the Product contains roughly 7 mg of caffeine, whereas a cup of caffeinated coffee provides 50–90 mg of caffeine. While even 7 mg of caffeine may seem low, it is of concern for those who have been advised to cut their intake due to kidney disease, anxiety disorders or caffeine sensitivity. For susceptible individuals, even small amounts of caffeine could increase agitation, anxiety, heart rate and blood pressure. Thus, just three small eight ounce cups of the Product, can result in the consumption of as much as half a cup of regular, caffeinated coffee's caffeine content.

6. Defendant's marketing claim that the Products are "Decaffeinated" as presented to consumers as a precise, verified figure. This, despite, upon information and belief, that Defendant does not disclose the testing methodology, sample size, or source of its conclusions

[1] Broderick PJ, Benjamin AB & Dennis LW, Caffeine and Psychiatric Medication Interactions: A Review, 98 J. OKLA. STATE MED. ASS'N 380 (2005), https://pubmed.ncbi.nlm.nih.gov/16206866/.
[2] https://pubmed.ncbi.nlm.nih.gov/17132260/

anywhere on the packaging or marketing materials of the Products. Nor does Defendant disclose the actual milligram caffeine content of the Products to consumers.

7. Plaintiff Santos and Class members, who have purchased the Products, bring this Action because of material representations which are false and misleading – namely, that the Products do not contain caffeine when the Products do contain caffeine. Upon investigation, and upon information and belief, the Products contain approximately 3% of the caffeine that the regular caffeinated versions contain.[3] This is a numerically and medically significant amount. Additionally, Defendant just started to label a select few of its Products, including its instant coffee formulation, as actually containing caffeine. However, it has not done so for its ground coffee nor its K-cup variation, and there continue to be these mislabeled Products sold at retail and online.

8. Defendant's representations to the contrary about caffeine are made in order to induce health-conscious consumers, like Plaintiff Santos, to purchase the Products. However, Defendant markets the Products in a way which is systematically misleading and false.

9. Against this backdrop, Plaintiff Santos and the Class members, on behalf of themselves and all others similarly situated, bring this Action seeking actual damages, statutory damages, restitution, pre- and post-judgment interest, and reasonable costs and attorneys' fees under state statutes and common law doctrines due to Defendant's intentional failure to ensure that the Products were distributed, produced, and sold in a manner consistent with advertising. As a result of the foregoing, Plaintiff Santos and Class members (defined below) were harmed, and continue to be harmed, by paying a price premium for the Products which they otherwise

[3] https://www.amazon.com/dp/B001ET5XXA?lv=shuf&channelId=500&plpRedirect=mhFallback, (last accessed Aug. 27, 2026).

would not have paid due to the misrepresentations made about on packaging and in advertising – or would not have purchased the Products at all.

## JURISDICTION AND VENUE

10. *Subject Matter Jurisdiction.* This Court has subject matter jurisdiction over this Action pursuant to the Class Action Fairness Act of 2005 ("CAFA") because there are (a) more than 100 members of the proposed classes, (b) nearly all members of the proposed classes have a different domicile or citizenship from a Defendant, and (c) the claims of the proposed class members exceed $5 million, exclusive of costs and fees.

11. *Personal Jurisdiction.* This Court has personal jurisdiction over Defendant because: (1) Plaintiff Santos resides in The Bronx, New York; and (2) Defendant conducts significant business in New York such that they purposefully availed themselves of the privilege of doing business in New York.

12. *Venue.* Venue is proper in this Court because Defendant transacts business within this District, Plaintiff is domiciled in this District, and a substantial part of the events giving rise to Plaintiff's claims took place in this District.

## PARTIES

### PLAINTIFF

***Plaintiff Kevin Santos***

13. Plaintiff Santos is domiciled in New York and resides in Bronx County, New York.

14. Plaintiff Santos purchased the Product at a retail store in New York for himself for personal use during the Class Period. Plaintiff Santos bought the Product during the statutory period because he relied on Defendant's representations including that the Product was free of

caffeine, which it is not. Plaintiff Santos has a heart condition so he deliberately chose the Product so that he could entirely avoid caffeine – but, contrary to Smucker's representations, the Product is not entirety free from caffeine. The Product is sold at a price premium and is more expensive than decaffeinated coffee drinks.

15. Plaintiff Santos relied on these misrepresentations – and had he known the truth, he would not have purchased the Products or would have paid significantly less for the Products. If the Products were sold as advertised – without caffeine – then Plaintiff Santos would buy those Products again.

## DEFENDANT

***Defendant The J.M. Smucker Co.***

16. Smucker maintains its principal place of business located in Orrville, Ohio and is organized under the laws of Ohio.

17. Upon information and belief, Smucker owns the Products.

18. Smucker or Smucker's subsidiary or affiliate (Bustelo) markets, manufactures, distributes, sells, or otherwise is responsible for the placement of the Products at their stores both online and at retail.

## FACTUAL ALLEGATIONS

***The Products and Defendant's Representations***

19. The Products command a price premium in the marketplace, comparable to or exceeding prices charged for competing decaffeinated instant coffee products that do not make an equivalent numerical "caffeine free" claim, a premium attributable at least in part to the perceived safety and purity conveyed by Defendant's "Decaffeinated" representation.

20. Indeed, Defendant prominently markets and labels the Products with the front-of package claim that it is "Decaffeinated" to market the Products as a superior, health-conscious choice for consumers seeking to avoid caffeine.

21. This precise, scientific sounding statistic is designed to, and does in fact, convey to reasonable consumers that the Products are virtually devoid of caffeine and therefore safe for regular, unrestricted consumption – including by individuals who must avoid or strictly limit caffeine intake for medical, psychiatric, or other personal reasons.

22. Defendant sells the Product through numerous nationwide and online retailers.

23. This per-ounce price is comparable to, and in many instances exceeds, the price charged for competing decaffeinated coffee products that do not make equivalent "caffeine-free" representations.

24. The prominent representations which Defendant makes are intended to, and do in fact, deceive consumers, leaving consumers to face the risk and consequences of unintended caffeine intake.




**IMAGE 1:** Café Bustelo Espresso Decaffeinated Ground Coffee

25. As seen above, there are issues with the packaging for the Products marketed by Defendant that is both false and misleading.

26. The packaging states "Decaffeinated" which is problematic because it is untrue; it is not entirely decaffeinated.

27. The representations that are made on the Products' packaging are critical because consumers, like Plaintiff and Class members, rely on them when they make their purchases. This is especially when a consumer chooses to buy a decaffeinated coffee beverage because those beverages are associated and are marketed to those with health-related interests. Further, consumers, like Plaintiffs and Class members, who buy the Products do so because they are looking for not just a healthy option, but one that specifically is devoid of caffeine.

28. Upon information and belief, the Products are decaffeinated using a chemical solvent-based extraction process. Café Bustelo admitted as much on their own website:[4]

> Response from Cafe Bustelo:
> 2 years ago
>
> **Consumer Relations**
>
> Thank you for reaching out. We appreciate your concern, and are happy to clarify that decaffeinating coffee using methylene chloride is a common, safe practice that is approved by the FDA. FDA regulations stipulate that methylene chloride residue in decaffeinated coffee beans is safe at concentrations of up to 10 parts per million. All of our products and labeling abide by these FDA regulations. we have reached out to you directly via email. We look forward to connecting with you soon.

[4] https://www.cafebustelo.com/coffee/ground/espresso-style-decaf-can, **(last accessed Aug. 28, 2026).**

29. Federal regulation permits the use of methylene chloride as an extraction solvent in decaffeinating coffee, subject to a maximum permissible residue in the finished product of 10 parts per million (0.001%)[5]. The existence of this residue tolerance reflects the understood reality that solvent-based decaffeination does not achieve complete removal of caffeine and instead, leaves behind measurable residual constituents in the finished Products. This, notwithstanding Defendant's prominent "Decaffeinated" marketing claim.

30. Defendant is no stranger to public scrutiny concerning this Product line. In August 2020, consumer watchdog Clean Label Project Foundation filed suit against Defendant in the U.S. District Court for the District of Columbia, alleging that Defendant's Café Bustelo decaffeinated ground coffee (the same product line at issue in this Action) was falsely marketed as "pure" notwithstanding independent laboratory testing that detected quantifiable methylene chloride residue. Defendant's brand was one of five major national coffee brand named in the suit[6].

*31.* Further undermining the reliability of Defendant's "Decaffeinated" claim, Defendant does not use a single, uniform caffeine-content representation across the different formulations of the Products. Upon information and belief, for example, certain Café Bustelo decaffeinated instant espresso coffee products offered for sale to consumers are labeled and marketed as "99.7% Caffeine Free," a figure materially different from the "Decaffeinated" claim made on the ground coffee formulation of the Products depicted above[7]. Reasonable consumers have no way of discerning why ostensibly comparable decaffeinated Products sold under the same

---

[5] 21 C.F.R. § 173.255.

[6] Complaint, Clean Label Project Foundation v. The J.M. Smucker Co., No. 1:20-cv-02311 (D.D.C. filed Aug. 20, 2020); see also Clean Label Project Announces Lawsuits Against Five of the Largest Coffee Brands for Including Paint Stripper Ingredient in Best-Selling Decaffeinated Products, PR NEWSWIRE (Aug. 20, 2020), https://www.prnewswire.com/news-releases/clean-label-project-announces-lawsuits-against-five-of-the-largest-coffee-brands-for-including-paint-stripper-ingredient-in-best-selling-decaffeinated-products-301118961.html;

[7] Café Bustelo® Decaffeinated Instant Espresso, 97% Caffeine Free, 3.5 Ounces, 4 Count, AMAZON, https://www.amazon.com/Bustelo-Decaffeinated-Espresso-Caffeine-3-5-Ounce/dp/B001EO777A (last visited Aug. 25, 2026) [subject to counsel's independent verification of current packaging prior to filing].

Café Bustelo brand carry differing, unsubstantiated caffeine-content percentages, further demonstrating that Defendant's precise numerical claims are not the product of any disclosed, uniform, or independently verifiable testing methodology, but are instead deployed selectively to enhance the perceived purity and marketability of the Products to health-conscious and caffeine-sensitive consumers.

***The Products are Not Caffeine-Free, and Residual Caffeine Poses Real Risks to Sensitive Consumers***

32. Contrary to the representations Defendant makes on the Products, it is well established that decaffeinated coffee – including the Products – contains measurable amounts of residual caffeine.

33. A peer review study indexed by the National Library of Medicine found that decaffeinated coffee samples collected from various coffee establishments contained caffeine in the range of 0 to 13.9 mg per 16-ounce serving[8].

34. The aforementioned study concluded that "[p]atients vulnerable to caffeine effects should be advised that caffeine may be present in coffees purported to be decaffeinated. Further research is warranted on the potential deleterious effects of consumption of 'decaffeinated' coffee that contains caffeine on caffeine-restricted patients[9]."

35. Another study found that an 8-ounce cup of decaf coffee contains up to 7 mg of caffeine on average — an amount that "may seem low" but "could be of concern for those who have been advised to cut their intake due to kidney disease, anxiety disorders or caffeine

[8] McCusker RR, et al., Caffeine Content of Decaffeinated Coffee, 30 J. ANALYTICAL TOXICOLOGY 611 (2006), https://pubmed.ncbi.nlm.nih.gov/17132260/.
[9] *Id.*

sensitivity," for whom "even small amounts of caffeine could increase agitation, anxiety, heart rate and blood pressure[10]."

36. According to GoodRx, decaf coffee "has almost all of the caffeine removed, but it still contains a small amount," and while it carries a lower risk of caffeine related side effects than regular coffee, it is not caffeine free[11]. Consistent with these findings, Consumer Reports has reported that servings of decaffeinated coffee, including widely sold commercial brands, can contain measurable residual caffeine. This is generally in the range of 3 to 12 milligrams per cup, depending on the brand and brewing method[12].

37. The U.S. Food and Drug Administration has recognized that "there is wide variation in both how sensitive people are to the effects of caffeine and how fast they eliminate it from the body," and that individuals with certain medical conditions, individuals taking certain medications, and pregnant or breastfeeding individuals may need to limit or avoid caffeine altogether in consultation with a healthcare provider[13].

38. A systematic review published in the Journal of Translational Medicine explains that caffeine "can interfere with sleep-wake cycles," "increase the body's flight-or-fight response, increasing stress and anxiety, precipitating panic attacks in those with anxiety and panic disorder," and that "acute caffeine exposure at high doses was also found to induce seizures[14]."

---

[10] HEALTHLINE, Caffeine in Average Decaf Coffee, https://www.healthline.com/nutrition/caffeine-in-decaf (last visited Aug. 20, 2026).

[11] GOODRX, Is Decaf Coffee Good or Bad for You?, https://www.goodrx.com/well-being/diet-nutrition/is-decaf-coffee-good-or-bad (last visited Aug. 20, 2026).

[12] CONSUMER REPORTS, Is Decaffeinated Coffee Bad for You?, https://www.consumerreports.org/coffee/is-decaffeinated-coffee-bad-for-you/ (last visited Aug. 25, 2026).

[13] U.S. Food & Drug Administration, Spilling the Beans: How Much Caffeine is Too Much?, https://www.fda.gov/consumers/consumer-updates/spilling-beans-how-much-caffeine-too-much (last visited Aug. 20, 2026).

**[14]** Low JJ-L, et al., Genetic Susceptibility to Caffeine Intake and Metabolism: A Systematic Review, 22 J. TRANSLATIONAL MED. (2024), https://doi.org/10.1186/s12967-024-05737-z.

39. The Cleveland Clinic identifies symptoms of caffeine overdose as including increased heart rate, heart palpitations, headache, anxiety, agitation, increased urination, increased thirst, diarrhea, and trouble sleeping, with more serious symptoms including difficulty breathing, sudden high blood pressure, muscle twitching, confusion, nausea, vomiting, and seizures, and further identifies caffeine's presence in numerous products beyond coffee, such that cumulative exposure — including from products believed to be caffeine-free — can meaningfully contribute to adverse outcomes[15].

40. Certain individuals experience allergic or intolerance-type reactions to compounds present in coffee, including decaffeinated coffee, which may still contain mycotoxins, biogenic amines, and other compounds capable of provoking histamine and allergic-type reactions in sensitive individuals, independent of caffeine content.[16][17]

41. Notwithstanding this body of scientific and medical literature, the Products' label discloses no information regarding its actual residual caffeine content, provides no warning that the Products may cause adverse reactions in caffeine-sensitive consumers, pregnant or nursing individuals, or individuals with cardiac, anxiety, or other relevant medical conditions, and provides no guidance regarding safe consumption limits for such individuals.

42. Instead, by emphasizing a specific "Decaffeinated" Defendant affirmatively conveys to reasonable consumers — and in particular to the caffeine-sensitive consumers most

---

[15] CLEVELAND CLINIC, What Causes a Caffeine Overdose?, https://my.clevelandclinic.org/health/diseases/caffeine-overdose (last visited Aug. 20, 2026).

[16] EDS CLINIC, Risks Associated with Coffee for Sensitive Individuals, https://www.eds.clinic/articles/histamine-caffeine-intolerance-coffee-allergy (last visited Aug. 20, 2026).

[17] Tania Dempsey, Caffeine Allergy, Coffee Intolerance: What You Need to Know, https://drtaniadempsey.com/caffeine-allergy-coffee-intolerance-what-you-need-to-know/ (last visited Aug. 20, 2026).

likely to seek out and rely on such a claim — that the Products are safe for unrestricted consumption without qualification, a message the underlying science does not support.

***Defendant's Representations Deceived Reasonable Consumers and Caused Economic Injury***

43. Reasonable consumers, including Plaintiff and Class members, understood Defendant's "Decaffeinated" claim to mean that the Product was, for all practical purposes, free of caffeine and its associated effects, and safe to consume without restriction by individuals seeking to avoid caffeine for health, medical, or personal reasons.

44. Reasonable consumers do not expect, and are not equipped independently to determine, that a product, and specifically the Products, prominently labeled "Decaffeinated" nonetheless contains a residual caffeine load capable of producing physiological effects in sensitive individuals, or that the marketed percentage may correspond to little more than an industry floor rather than a genuine mark of distinction or superior purity.

45. Defendant's claim is material to reasonable consumers' purchasing decisions. Consumers, including Plaintiff and Class members, who purchase decaffeinated coffee do so specifically to avoid the effects of caffeine; a representation bearing directly on the very attribute that motivates the purchase is, by definition, material.

46. Due to Defendant's deceptive and misleading conduct, Plaintiff and Class members paid more for the Product than they would have absent Defendant's misrepresentations, purchased the Products when they otherwise would not have, and/or were exposed to undisclosed health risks associated with residual caffeine consumption from the Products that Defendant had a duty to disclose but willfully omitted.

47. Indeed, the Defendant sells the Product at a price premium – it is more expensive than regular Café Bustelo, as well as more expensive than other brands of decaffeinated coffee – including those which actually are nearly entirely free or actually entirely free of caffeine.

| SELLER | BRAND | CAFFEINE | PRICE PER OUNCE |
|---|---|---|---|
| Amazon | CAFÉ BUSTELO (DECAFFEINATED) | 7 mg per serving | $0.94 per ounce |
| Amazon | CAFÉ BUSTELO (CAFFEINATED) | 60-90 mg per serving | $0.71 per ounce |
| Amazon | INUBAN (DECAFFEINATED) | 0-1 mg per serving | $0.60 per ounce |
| Amazon | LAVAZZA (DECAFFEINATED) | 0-3 mg per serving | $0.92 per ounce |
| Amazon | FOLGERS (DECAFFEINATED) | 1-3 mg per serving | $0.79 per ounce |
| Amazon | CAFÉ AROMA (CUBAN STYLE) (DECAFFEINATED) | 2-3 mg per serving | $0.64 per ounce |

48. Plaintiff and Class members did not receive the benefit of their bargain and suffered damages, including actual monetary damages, as a result of Defendant's conducts in deceiving, misrepresenting, or otherwise omitting the true nature of the Products.

## CONSUMER HARM

49. Due to the significant number of sales of the Products, there are likely tens of thousands of consumers who have purchased and are continuing to purchase the Products distributed, marketed, produced, and sold by the Defendant. This inference is corroborated by Defendant's own financial disclosures. For the fiscal year ending in April 2025, Defendant reported net sales of approximately $2.8 billion in the U.S. Retail Coffee segment alone, and

specifically identified the Café Bustelo brand as a contributor to volume growth within that segment during the same period[18]. Given this, it is reasonable to infer that the number of affected consumers numbers well into the hundreds of thousands, if not millions, nationwide.

50. Given that the Products do in fact contain caffeine, the Products do not comport with their packaging. As a result, consumers, like Plaintiffs and Class members, are entirely misled into buying the Products and even to pay a premium for these items. Furthermore, the deleterious health impacts and risks consuming the Products is a material fact omitted on packaging which further harms reasonable consumers, including Plaintiffs and Class members.

51. As such, Plaintiffs and Class members were harmed, and continue to be harmed, in the form of the monies they paid for the Products which they would not have otherwise paid had they known the truth.

## CLASS ACTION ALLEGATIONS

52. Plaintiff Santos brings this Action individually and on behalf of all other persons similarly situated pursuant to Fed. R. Civ. P. 23, *et seq.*, seeking certification of the proposed classes (collectively, the "Class"):

> **Nationwide Class**: All persons within the United States who purchased the Products from the beginning of any applicable statute of limitations period through the date of judgment or until the conduct alleged ceases ("Class Period").

53. Excluded from the proposed Class are Defendant and any such entities in which the Defendant has a controlling interest, the Defendant's agents, employees and legal representatives, any judge or judicial officer to whom this matter is assigned and any member of

[18] The J.M. Smucker Co., Announces Fiscal Year 2025 Fourth Quarter Results (June 10, 2025), https://investors.jmsmucker.com/news/news-details/2025/The-J-M--Smucker-Co--Announces-Fiscal-Year-2025-Fourth-Quarter-Results/default.aspx (reporting U.S. Retail Coffee segment net sales of $2,806.6 million for fiscal year 2025 and $738.6 million for the fourth quarter, and Café Bustelo® brand volume growth).

such judge or judicial officers' staff and immediately family, as well as all resellers of the Products.

54. ***Numerosity***. The members of the Class are so numerous that joinder would be inefficient and impracticable. Based upon Defendant's annual sales statistics, there are at least tens of thousands of Class members across the country.

55. ***Commonality***. There are common questions of law and fact relevant to the Class, and these questions predominate over any questions affecting individual Class members. These common questions of law and fact include, without limitation:

i. Whether Defendant violated state and common law statutes and doctrines;

ii. Whether Defendant engaged in the conduct as alleged;

iii. Whether Defendant failed to warn of the risks that followed the foreseeable use of its Products;

iv. Whether Defendant was unjustly enriched;

v. Whether Plaintiffs were harmed;

vi. The measure of damages to Plaintiff Santos and Class members; and,

vii. Whether Plaintiff Santos is entitled to declaratory and injunctive relief.

56. ***Typicality***. Plaintiffs claims are typical of those of other Class members because Plaintiff, like every other Class member, was harmed by way of the conduct as alleged herein. Plaintiff, like all other Class members, was injured by Defendants' uniform conduct. Plaintiff is advancing the same claims and legal theories on behalf of themselves and all other Class members, such that there are no defenses unique to Plaintiff. The claims of Plaintiff and those of the other Class members arise from the same operative facts and are based on the same legal theories.

57. ***Adequacy of Representation***. Plaintiff will fairly and adequately represent and protect the interests of the Class members in that they have no disabling or disqualifying conflicts of interest that would be antagonistic to those of the other members of the Class. The damages and infringement of rights that Plaintiff suffered are typical of other Class members, and Plaintiff seeks no relief that is antagonistic or adverse to the members of the Class. Plaintiff has retained counsel experienced in consumer protection class action litigation, and Plaintiff intends to prosecute his action vigorously.

58. ***Superiority of Class Action***. A class action is superior to other available methods for the fair and efficient adjudication of this controversy, as the pursuit of numerous individual lawsuits would not be economically feasible for individual Class members, and certification as a class action will preserve judicial resources by allowing the Class common issues to be adjudicated in a single forum, avoiding the need for duplicative hearings and discovery in individual actions that are based on an identical set of facts. In addition, without a class action, it is likely that many members of the Class will remain unaware of the claims they may possess.

59. The litigation of the claims brought herein is manageable. Defendant' uniform conduct, the consistent provisions of the relevant laws and the ascertainable identities of Class members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

60. Adequate notice can be given to Class members directly using information maintained in the parties' records.

61. ***Predominance***. The issues in this action are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.

62. This proposed class action does not present any unique management difficulties.

**FIRST CAUSE OF ACTION**

**NEW YORK'S CONSUMER PROTECTION LAW**
**N.Y. GEN. BUS. LAW § 349 ("GBL § 349")**

63. Plaintiffs repeat the allegations in Paragraphs 1-62 as if fully set forth herein.

64. For purposes of GBL § 349, Defendant is considered a business, and Plaintiff (as well as Class members) are considered consumers.

65. The GBL § 349 prohibits deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service.

66. Defendant committed deceptive acts or practices by employing false, misleading, and deceptive representations and/or omissions about the presence (or risk of a presence) of the health and efficacy concerns associated with the Products.

67. Information as to the content in the Products was in the exclusive control of Defendant. Plaintiff could not possibly have known that the representations made on packaging as aforementioned were not only false, but misleading.

68. Because Plaintiff bought the Products countless times, Plaintiff has standing to pursue this claim because Plaintiff has suffered an economic injury due to lost money or property as a result of Defendant's acts or practices. When Plaintiff purchased the Products, Plaintiff relied on false, misleading and deceptive representations that the Products consistent with labelling on the packaging. Plaintiff spent money in the transaction that Plaintiff otherwise would not have spent had he known the truth about the Products.

69. Defendant's conduct was deceptive in a materially misleading way because it violates consumer's reasonable expectations. Defendant knew consumers would purchase its

Products and/or pay more for them under the false – but reasonable – belief that they were free of caffeine.

70. Defendant knew that this health information about its Products, which are specifically marketed toward health-conscious consumers, remain material to these types of consumers. As a result of its deceptive acts and practices, Defendant sold the Products to unsuspecting consumers nationwide, as well as to thousands of unsuspecting consumers Nationwide, and in New York.

71. As a direct and proximate result of Defendant's false, misleading and deceptive representations and/or omissions, Plaintiff and Class members were injured in that they: (i) overpaid for the Products that were not what Defendant represented, (ii) were deprived of the benefit of the bargain because the Products were different than what was advertised and marketed, and (iii) were deprived of the benefit of their bargain because the Products they purchased had less value than if Defendant had adequately disclosed the risks of consumption and the correlation to health problems as stated above.

72. On behalf of themselves and Class members, Plaintiff seeks to enjoin Defendant's unlawful acts and practices – as well as to have warnings added to the packaging of the Products.

73. Additionally, on behalf of himself and Class members, Plaintiff also seeks to recover their actual damages, statutory penalties, whichever is greater, three times his actual damages, as well as reasonable attorneys' fees.

## SECOND CAUSE OF ACTION

### VIOLATIONS OF NEW YORK'S FALSE ADVERTISING LAW
### N.Y. GEN. BUS. LAW § 350 ("GBL § 350")

74. Plaintiff repeats the allegations in Paragraphs 1-62 as if fully set forth herein.

75. Defendant engaged in a campaign of false and misleading advertising and marketing with regard to the health of its Products to deceive consumers into believing that the Products did not contain caffeine – when, in reality, this was untrue.

76. Because Plaintiff bought the Products numerous times, Plaintiff has standing to pursue this claim because he has suffered an economic injury due to lost money or property as a result of Defendant's acts or practices. When Plaintiff purchased the Products, he relied on false, misleading and deceptive representations, as well as omissions to the contrary, which led him to believe that the Products are as advertised on its packaging. Plaintiff spent money in the transaction that he otherwise would not have spent had he known the truth about the Products.

77. Defendant's conduct was deceptive in a materially misleading way because it violates consumer's reasonable expectations. Defendant knew consumers would purchase its Products and/or pay more for them under the false – but reasonable – belief that they were caffeine-free, and therefore healthy and consistent with the advertising on the packaging.

78. Defendant knew that this health information about its Products, which are specifically marketed toward health-conscious purchasers, are material to consumers. As a result of its false advertising, Defendant sold the Products to unsuspecting consumers nationwide.

79. As a direct and proximate result of Defendant's false, misleading and deceptive representations and/or omissions, Plaintiff and Class members were injured in that they: (i) overpaid for the Products that were not what Defendants represented, (ii) were deprived of the

benefit of the bargain because the Products were different than what was advertised and marketed, and (iii) were deprived of the benefit of the bargain because the Products they purchased had less value than if Defendant had adequately disclosed the truth about them.

80. On behalf of themselves and Class members, Plaintiff seeks to enjoin Defendant's unlawful acts and practices. On behalf of himself and Class members, Plaintiffs also seek to recover his actual damages or $500.00 in statutory penalties, whichever is greater, three times her actual damages, as well as reasonable attorneys' fees.

**THIRD CAUSE OF ACTION**

**FAILURE TO WARN**

81. Plaintiffs reallege the allegations of Paragraphs 1-62 as if fully set forth herein.

82. It is the responsibility of manufacturers of products (and which extend to the original or ultimate purchaser of a product) to warn of foreseeable and unreasonable risks of harm; privity need not exist. Such claims depend on reasonableness and public policy concerns at the heart of the purchasing transaction.

83. In this instance, Defendant was in unique control over the facts – that the Products have an actual tendency to increase the possibility of health issues due to the caffeine presence in the otherwise marketed caffeine-free beverages. Despite this knowledge, Defendant failed, and continues to fail, to warn Plaintiff and Class members of this risk.

84. Plaintiff seeks all available forms of damages, including injunctive relief with respect to labeling and warnings, that are available in New York under the tortious act of failure to warn.

## FOURTH CAUSE OF ACTION

## UNJUST ENRICHMENT

85. Plaintiffs reallege the allegations of Paragraphs 1-62 as if fully set forth herein.

86. Defendant received benefits from Plaintiff and Class members and therefore, has unjustly retained those benefits at their expense.

87. Defendant received benefits from Plaintiff and Class members in the form of the Plaintiff and Class members' compensation provided for the Products.

88. These purchases provided the Defendant with economic, intangible, and other benefits, including money.

89. Had Plaintiff and Class members known of Defendant's misconduct, they would not have paid for the Products or would have paid less for the Products.

90. Defendant unjustly retained these benefits at the expense of Plaintiff and Class members because Defendant's conduct damaged Plaintiff and Class members, all without providing any commensurate compensation to Plaintiff and Class members.

91. The benefits that Defendant derived from Plaintiff and Class members rightly belong to Plaintiff and Class members. It is inequitable for Defendant to retain any of the profit or other benefits it derived from the unfair and unconscionable methods, acts, and trade practices with respect to the Products alleged in this Action.

92. Defendant should be compelled to disgorge into a common fund, for the benefit of Plaintiff and Class members, all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper.

## REQUEST FOR RELIEF

93. Plaintiff Santos, on his own behalf and on behalf of the Class and the Sub-Class, requests the following relief:

a. An order certifying the Class and the Sub-Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff Santos as Class and Sub-Class Representatives and his attorney as Class Counsel;

b. A declaration that Defendant are financially responsible for notifying Class and Sub-Class members of the pendency of this suit;

c. An order declaring that Defendant's conduct violates the consumer protection statutes cited;

d. Actual damages;

e. Statutory damages;

f. An order providing appropriate equitable relief in the form of an injunction against Defendant's unlawful and deceptive acts and practices, and requiring proper, complete, and accurate representation and labeling of the Products;

g. Pre- and post- judgment interest on all amounts awarded;

h. Other injunctive relief as the Court may deem appropriate; and

i. An order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit.

## JURY TRIAL DEMAND

94. Plaintiff hereby demands a trial by jury.

Respectfully submitted,

DATED: August 28, 2026

**YAGMAN PLLC**

/s/ *Blake Hunter Yagman*
Blake Hunter Yagman
Allen Neumark (Pro Hac Vice Forthcoming)
626 REXCORP PLAZA, SUITE 605
Uniondale, New York 11556
*blake.yagman@yagmanpllc.com*
*allen.neumark@yagmanpllc.com*
Tel: (929) 709-1493

*Attorney for Plaintiff* KEVIN SANTOS
*and the Proposed Class*